# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

CHERYL R. MAXIM,                  )   1:08cv0537 DLB
                                  )
                                  )
                                  )   ORDER REGARDING PLAINTIFF'S
                  Plaintiff,      )   SOCIAL SECURITY COMPLAINT
                                  )
     v.                           )
                                  )
MICHAEL J. ASTRUE, Commissioner   )
of Social Security,               )
                                  )
                                  )
                  Defendant.      )
_____  )

## BACKGROUND

Plaintiff Cheryl R. Maxim ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed her application for DIB on July 16, 2002. AR 92-94. Plaintiff alleged disability since October 20, 2001, due to anxiety, myofascial pain syndrome, cervical

---

[1]The parties consented to the jurisdiction of the United States Magistrate Judge. On October 20, 2008, the matter was reassigned to the Honorable Dennis L. Beck for all purposes.

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

spondylosis, and muscle spasms.  AR 109.  After being denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 45-48,51-55, 56-57.  On June 24, 2003, ALJ William C. Thompson, Jr., held a hearing.  AR 786-829.  ALJ Thompson denied benefits on September 12, 2003.  AR 31-44.  Following Plaintiff's request for review, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings.  AR 81-84.

On August 10, 2005, ALJ Thompson held another hearing.  AR 830-60.  ALJ Thompson denied benefits on June 28, 2006.  AR 16-26.  The Appeals Council denied Plaintiff's request for review on March 5, 2008.  AR 7-11.

Hearing Testimony

Following remand by the Appeals Council, ALJ Thompson held a hearing on August 10, 2005, in Stockton, California.  Plaintiff appeared with her attorney, Jeffrey Milam.  AR 832. Vocational expert ("VE") Susan Moranda also appeared and testified.  AR 832, 852-58.

At the time of the hearing, Plaintiff was 52.  She was born in May 1953.  AR 834.  She is five feet tall and weighs approximately 160.  She is married.  She has a 21-year-old child that still lives with her.  AR 836.

Plaintiff testified that since 1990 she mostly worked as a waitress.  She took orders, seated people, carried food, bussed tables, cleaned and occasionally worked as a cashier.  AR 837.  She stopped working as a waitress when she got this "sudden woof" through her body, up into her head, and felt something was not right.  She felt like she was dying.  That and the pain she gets prevent her from working.  She gets severe pain when she does different things.  AR 838.

She has episodes if there is a lot of stress.  She cannot take the "least little bit of stress." AR 838.  She sees "Dr. Newmeyer" every month and he has her on Xanax four times a day.  It has made a difference.  She does not get the "sudden woof," but she does get the stress and the nerves.  AR 839.

Plaintiff testified that she has pain in the back of her neck on the left, in the scapula and in her head.  Her head goes numb, mainly on the left side.  She receives medical treatment for her

problems.  AR 839.  "Dr. Maisson" has been treating her with Neurontin for two years.  It has made somewhat of a difference as long as she does not do different things.  She has had physical therapy two or three times for her neck.  She does exercises, uses heat and massage to relieve pain.  AR 840.  She has pain in her neck or her shoulders, mainly the left, every day.  AR 841. The pain goes down her arm to just above the elbow.  AR 841-42.  She has numbness in her hands almost every day.  It lasts from a couple minutes to about 15-20 minutes.  AR 842.

Plaintiff testified that she is not able to do housework.  She can dust.  She does dishes, but cannot put them away because reaching causes pain.  She very rarely cooks.  She does not go grocery shopping or to church.  She goes to Costco with her husband.  She occasionally goes to a store when she is able to drive.  She occasionally drives.  AR 844.

Plaintiff testified that she sleeps through the night most of the time because of narcolepsy. She is being treated for it by Jen Smith and takes Adderall twice a day.  AR 844.

Plaintiff testified that she has difficulty with walking.  AR 844-45.  She tires very easily and her legs hurt.  She usually can walk about five or ten minutes without hurting.  She can stand about five to ten minutes without having to lift one leg or the other.  She has swelling on her right leg and her foot.  She has psoriasis on the bottom heel of her left foot.  AR 845.

Plaintiff has problems with sitting.  AR 845.  She falls asleep.  During the day, she makes candles once in while and talks on the phone when she can.  She takes care of her three dogs. Her husband usually feeds them because she forgets.  AR 846.

In response to questions from her attorney, Plaintiff testified that she sleeps at night most of the time.  Her sleep patterns would have a bearing her ability to work.  She is fatigued.  Her sleep varies and depends to some degree on other problems.  She is still having symptoms related to urinary frequency and accidents.  AR 847.  The symptoms from her diabetes are worse.  She is getting treatment for fibromyalgia.  It is primarily in the neck and the shoulders.  AR 848.  She has problems using her hands to do things.  AR 848-49.  She can use them for a half hour to an hour before she has to stop and rest for a couple hours.  AR 849.

Plaintiff indicated that she held back tears as she testified.  It happens a lot and she gets emotional.  AR 849.  She is taking over 20 medicines on a daily basis, which has an impact on

1   her ability to work because they cause drowsiness.  She has talked to the doctor about it.  The

2   doctor tried weaning her off of Neurontin and cannot do it.  AR 850.

3        Plaintiff testified that Dr. Lon Keith treats her for cardiological problems.  AR 850-51.

4   She has a blocked artery and is going to get a cardiac catheterization.  AR 851.  She also gets

5   pain in her shoulder, scapula, back and spine.  Reaching out and reaching up cause pain.  She is

6   not able to care for her personal hygiene like she used to, but she does not need help.  AR 852.

7        VE Susan Moranda also testified.  She described Plaintiff's past work as a waitress, DOT

8   card of 311.477-030, as semiskilled on a lower level, SVP 3.  It is considered light exertion as

9   performed in the national economy.  AR 852.

10       Plaintiff also testified that she worked as a home health aide and took care of her dad for

11  eight months until he died.  AR 852.  She then took care of her mother-in-law for six or seven

12  months.  She was paid for the work with her mother-in-law by county social services.  She

13  cooked for her mother-in-law, took her to therapy sessions, bathed her, assisted her in and out of

14  bed, and helped her walk.  AR 853-54.  The VE testified that this past work was a home health

15  aide, non-medical, with a DOT code of 355.674-014.  It is semiskilled on the lower level, SVP 3.

16  It is generally considered medium exertion as performed in the national economy.  AR 854.

17       For the first hypothetical, the ALJ asked the VE to consider a 52-year-old individual

18  educated to the tenth grade who is literate and has Plaintiff's past work history.  This individual

19  is capable of lifting 20 pounds occasionally and 10 pounds frequently.  She is capable of sitting

20  without limit if not required to stand or walk.  She can occasionally bend, stoop, twist, squat and

21  kneel, but should not crawl.  She should not climbs ladders or scaffolding, but can climb stairs.

22  She should not work at heights or run hazardous moving machinery.  She should not be required

23  to perform overhead reaching with either arm.  She should have relatively restricted contact with

24  the general public and with co-workers.  She can work in the presence of others, but should not

25  be part of a work team or a cooperative work process.  AR 854.  The VE testified that with those

26  limitations there would be some jobs the individual could perform.  AR 854-55.  One job would

27  be small parts assembler, DOT code of 739.687-030.  It is unskilled, SVP 2, and is considered

28  light exertion as performed in the national economy.  The VE eroded the number of jobs by 50

4

percent because of the limitations, which would leave approximately 48,000 individuals employed in California.  The VE's job classifications were consistent with the DOT.  AR 855.

In response to questions from Plaintiff's counsel, the VE testified that part of the erosion was related to the restricted co-worker category.  AR 855-56.  The VE eroded the total amount by 50 percent.  The VE also testified that the overhead reaching was significant and that the hypothetical would have a restriction to being on the feet no more than six hours.  The VE had observed these jobs and estimated that approximately 50 percent of the small parts assemblers allow for a sit/stand option.  AR 856.  If the hypothetical were the same, but the reaching restriction was for occasional reaching out in front, the person would not be able to do the job because most assembler positions are frequent to constant reaching.  AR 856.

Plaintiff's attorney asked the VE to assume the first hypothetical and add that the person would need bathroom access at least once an hour in addition to usual, customary breaks.  The VE testified that a person would not generally be able to perform the assembler jobs because they are production oriented and there would often be work quotas to maintain employment.  AR 857.

Plaintiff's attorney asked the VE to consider the first hypothetical and add that the person had a stress problem where one would get emotional for the amount of time that Plaintiff had been upset during the 45-minute hearing.  The VE testified that this would detract from being able to maintain a quota or production job.  It would be disruptive.  AR 857.

The VE also testified that some of the jobs would allow you to move your head from side to side and stretch it on a fairly consistent basis.  The VE imagined that in most of these jobs "you're going to be twisting your neck from side to side."  AR 858.

<u>Medical Record</u>

On February 25, 2000, Plaintiff saw Lisa Masson, M.D., for complaints of right arm pain and neck pain.  Dr. Masson prescribed Voltaren.  AR 251.

On November 1, 2001, Plaintiff received treatment for acute anxiety and was prescribed Xanax.  AR 223.

1       On November 4, 2001, Plaintiff was treated in the emergency room for complaints of

2  paraesthesia/discomfort of the scalp.  She was diagnosed with occipital neuralgia and prescribed

3  hydrocodone and acetaminophen.  AR 153, 157.

4       On November 5, 2001, Plaintiff saw Denise Wofford, P.A.C., for a recheck following

5  multiple headaches and elevated blood pressure.  On examination of her neck, Plaintiff had some

6  tenderness over the left paravertebral muscles and tightness over trapezius muscles.  Her range of

7  motion was intact.  PAC Wofford assessed probable cervical strain with resulting headache and

8  hypertension with poor control.  She was continued on Diovan and Wellbutrin.  She also was

9  prescribed Clonidine, given Toradol for headache pain and provided neck range of motion

10  stretching exercises.  AR 220.

11       On November 13, 2001, Plaintiff reported discomfort in her neck and shoulders.  She had

12  no weakness and no paresthesias.  AR 218.  On examination, she had good range of motion in

13  her neck and shoulders.  AR 218.  Dr. Masson assessed Plaintiff with bursitis/tendonitis, a

14  history of gastric ulcer, hypertension and neck sprain.  AR 218-19.

15       On November 27, 2001, Plaintiff complained to Dr. Masson of episodes of anxiety and

16  indicated that if she reaches up, she feels tired.  She also reported pain from neck to chest, like a

17  burn, and a sore back with burning.  Plaintiff used a massager and felt relief.  AR 214.  Dr.

18  Masson assessed Plaintiff with anxiety.  She was to continue Wellbutrin and add Desyrel.  Dr.

19  Masson also assessed cervical strain and provided Plaintiff with exercises.  AR 215.

20       On February 20, 2002, Plaintiff saw Dr. Masson and complained of feeling stress in the

21  left side of her neck.  On examination, her neck was non-tender.  She was assessed with stress

22  and family disruption.  AR 209.

23       On March 26, 2002, Plaintiff sought treatment from Dr. Masson.  On examination,

24  Plaintiff had no point tenderness and good range of motion of her neck.  Her left trapezius was

25  tight.  AR 201.  Dr. Masson assessed Plaintiff with cervical strain/pain, persistent, ordered an x-

26  ray and prescribed a trial of Skelaxin.  Dr. Masson also discussed disability for left shoulder and

27  neck pain.  AR 201.

28

On March 27, 2002, Dr. Clifton Choo reviewed a radiological report of Plaintiff's cervical spine.  He concluded that Plaintiff had multilevel cervical spondylosis extending from C3 down to C7, most prominent at C6-7 interspace with neural foraminal encroachment at these levels bilaterally.  AR 198.  Her left shoulder was intact.  AR 199.

From April 1, 2002 to July 12, 2002, Plaintiff attended ten physical therapy sessions for neck and shoulder pain.  AR 165.

On April 22, 2002, Plaintiff requested a referral to mental health.  Plaintiff stated that she had been seeing a therapist and was doing great, but now she was back to square one.  She was given the Behavioral Health number.  AR 193.

On April 29, 2002, on referral from Dr. Masson, Plaintiff saw PA-C Mark Madsen in the Orthopedic Spine Clinic for evaluation of neck pain, headache and left shoulder pain.  AR 181.  On physical examination, Plaintiff had some mild left occipital area tenderness.  Her motor function in the upper extremities was 5/5.  X-rays showed some slight straightening of the normal cervical lordosis.  She had disk degeneration at C3-4, C4-5, C5-6 and C6-7.  At C6-7, there was disk space collapse, anterior osteophyte formation and some slight posterior osteophyte formation.  C4-5 and C5-6 were roughly the same.  At C3-4, she had moderate posterior spur formation which appeared to create moderate narrowing of the neural foramina at C3-4 bilaterally.  AR 182.  PA Madsen assessed Plaintiff with cervical disk degeneration, cervical discogenic mechanical pain and myofascial pain syndrome.  AR 182.  PA Madsen opined that Plaintiff was not a candidate for surgical intervention and she should continue to pursue conservative treatment methods.  Plaintiff declined injections.  AR 183.

On August 2, 2002, Plaintiff again saw PA Madsen.  A MRI revealed multilevel cervical disc degeneration and cervical straightening with loss of normal lordosis.  Plaintiff had some moderate disc degeneration and bulges at C3-4, C4-5, C5-6 and somewhat at C6-7.  She had some mild decreased AP diameter of the spinal cord at C3-4, C4-5 and C5-6.  She also had moderate bilateral neural foraminal narrowing, right greater than left at C3-4.  AR 178.  PA Madsen assessed myofascial pain syndrome and again opined that Plaintiff was not a surgical candidate.  AR 178.  He suggested she see Dr. Gesson for an occipital block and trigger point

injections.  AR 178.  It gave her a lot of anxiety to think about, but Plaintiff was willing to try it.
She said that physical therapy made her feel worse.  AR 178.

On August 21, 2002, Sandra Clancey, M.D., a state agency medical consultant, completed
a Physical Residual Functional Capacity Assessment form.  Dr. Clancey opined that Plaintiff
could lift and carry 20 pounds occasionally, 10 pounds frequently, could stand or walk about 6
hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday and could push and
pull without limitation.  AR 257.  She frequently could climb ramps, stairs or ladders, but never
could climb rope or scaffolds.  She frequently could balance, stoop, kneel and crouch.  She
occasionally could crawl.  AR 258.  Dr. Clancey further opined that Plaintiff was limited in
overhead reaching.  She had no visual, communicative or environmental limitations.  AR 259-60.

On August 29, 2002, the state agency medical consultant completed a Psychiatric Review
Technique form.  AR 264.  The consultant opined that Plaintiff's psychiatric impairment(s) was
not severe.  AR 264.  She had no restriction of activities of daily living and no difficulties in
maintaining social functioning.  She had mild difficulties in maintaining concentration,
persistence or pace.  AR 274.

On November 18, 2002, Daniel R. Katzenberg, M.D., completed a neurological
evaluation of Plaintiff.  AR 278-79.  On physical examination, Plaintiff's neck was stiff with
limited range of motion.  She could only flex forward 50 degrees, extend backward 10 degrees
and rotate 60 degrees side to side.  AR 278.  On neurological evaluation, Plaintiff was awake,
alert and oriented.  Her motor tone and bulk were within normal limits and her power was 5/5
throughout.  Her finger-nose-finger, fine finger movements and rapid alternating movements
were done smoothly.  Her gait was normal and heel, toe and tandem walk were performed
without difficulty.  Her deep tendon reflexes were 2+ and symmetric.  There was no Romberg
sign or pronator drift.  Dr. Katzenberg opined that Plaintiff had degenerative joint disease of
cervical spine.  She had limited mobility of the neck, but no evidence of myelopathy or
radiculopathy.  AR 279.  To avoid straining the neck, Plaintiff should probably avoid lifting and
carrying more than 20-25 pounds occasionally and 15-20 pounds frequently.  She should not

crawl.  Dr. Katzenberg further opined that Plaintiff had no other particular physical restrictions and had good strength in her arms and legs.  AR 279.

On December 6, 2002, Plaintiff saw Dr. Masson and reported a bout of neck and shoulder pain after putting up the Christmas tree.  She also reported having an anxiety attack.  AR 452.

On December 17, 2002, Plaintiff complained to Dr. Masson of severe panic the previous night and some suicidal ideation.  For anxiety, Dr. Masson stopped Wellbutrin and started Plaintiff on Prozac.  Dr. Masson noted "[m]ood questionnaire 8 yeses [sic], serious problem" and started Plaintiff on Zyprexa.  AR 437.

On December 18, 2002, Gregory Fields, Ph.D., a licensed psychologist, completed a consultative evaluation.  Plaintiff reported that she was able to drive, shop for groceries, prepare meals, do laundry and do housework with modification.  She received some assistance from her family.  On mental status, Plaintiff scored 29/30 on the Folstein Mini Mental Status Exam.  AR 281.  She was alert and grossly oriented to purpose, time and location.  She presented with no gross attentional difficulties.  She provided her history without notable difficulty and seemed to recall recent and remote aspects of her personal history equally well.  Plaintiff described herself as primarily anxious.  Her insight and judgment were estimated to be fair.  There was no evidence of a formal thought disorder.

Dr. Fields diagnosed Plaintiff with Anxiety Disorder NOS, Rule Out Panic Disorder without Agoraphobia, Rule Out psychological factors affecting medical condition.  AR 282.  Dr. Fields opined that Plaintiff's ability to deal with the public, supervisors and co-workers appeared to be moderately limited.  When confronted with straightforward one and two step tasks, Plaintiff would likely have no difficulty.  AR 282.  Her ability to perform increasingly complex multi-step and higher-level cognitive tasks was not thoroughly evaluated, but brief mental status testing was not suggestive of gross impairments.  AR 282-83.  Plaintiff's ability to withstand the stress and pressure associated with the interview and mental status testing was minimally limited.  She presented with the basic cognitive capacity to handle supplementary funds regarding routine daily financial transactions.  Her prognosis was guarded.  AR 283.

On December 31, 2002, Plaintiff saw Dr. Masson and complained of stress urinary incontinence. She was "[d]oing better in her head" with only "a twinge of anxiety." AR 430. Plaintiff was taking Prozac and Zyprexa and noticed fatigue. AR 430.

On January 6, 2003, Charlotte Bible, M.D., a state agency medical consultant, completed a Psychiatric Review Technique form. Dr. Bible opined that Plaintiff's mental impairment(s) was not severe. AR 286. Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace. AR 296.

On January 7, 2003, Patrick A. Bianchi, M.D., a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment form. Dr. Bianchi opined that Plaintiff could lift and carry 20 pounds occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday and could push and/or pull without limitation. AR 301. She frequently could climb, balance, stoop, kneel, and crouch, but could never crawl. AR 302. She did not have manipulative, visual, communicative or environmental limitations. AR 303-04.

Plaintiff saw Dr. Masson for follow-up on January 28, 2003. Plaintiff reported that her fatigue persisted and she was taking 3 hour naps. AR 414. Dr. Masson assessed Plaintiff with hypoglycemia, anxiety, fatigue and hypertension and increased her Zyprexa. Treatment notes identified approximately eleven current prescriptions for Plaintiff, including Prozac[3], Zyprexa[4], Clonidine, and Neurontin. AR 415.

Dr. Masson also completed a questionnaire and opined that Plaintiff's medical problems precluded her from performing any full-time work at any exertional level, including the sedentary level. Plaintiff's primary impairments were hypertension, anxiety and back/neck/head pain. Dr. Masson opined that Plaintiff could sit 4 hours in an 8-hour day and could stand/walk 30 minutes at a time for 4 hours total in an 8-hour day. She did not need to lie down or elevate her legs. Dr.

---

[3] Prozac is commonly prescribed to treat depression.

[4] Zyprexa is commonly prescribed to treat Bipolar I Disorder and Schizophrenia.

Masson based her opinion on objective findings of trigger points, hypertension and tachycardia. With regard to additional work limitations, Dr. Masson noted that Plaintiff's stress was "an issue." AR 326. Dr. Masson further indicated that Plaintiff could lift 2-5 pounds frequently and 5 pounds occasionally. She could not reach, but could handle, feel and grasp 4 hours in an 8-hour day. She could push/pull for 30 minutes in an 8-hour day. With her hands, she could handle for 1 hour and feel for 1 hour without resting. She could push/pull for 15 minutes and grasp for 30 minutes at one time without resting. Dr. Masson believed that Plaintiff had been disabled since October 1, 2002. AR 327.

On February 11, 2003, Plaintiff was examined by Karl Bui, D.P.M., for bilateral pain in the back of her heels. Dr. Bui assessed achilles tendonitis and achilles hallucis longus tendinitis right foot. AR 394. She was dispensed heel lifts and directed to implement stretching. AR 395. That same day, Dr. Masson indicated that Plaintiff's anxiety was "much better on Zyprexa." AR 403.

On March 14, 2003, Celina Hetnal, M.D., F.A.C.E., completed an endocrinology consultation. Dr. Hetnal diagnosed diabetes mellitus type 2 and hyperlipidemia. AR 382-83.

On March 20, 2003, Robert L. Morgan, Ph.D., a clinical psychologist, completed an evaluation of Plaintiff at the request of her attorney. Plaintiff reportedly drove to the evaluation. AR 346. She complained to Dr. Morgan that bending over caused physical distress and that she was unable to extend her arms without excruciating pain. She also noted difficulties staying awake because of her medications and that she was not thinking clearly. AR 347. As to her daily activities, Plaintiff reported that she engaged in domestic activities such as straightening up the house, cooking and shopping. She spent time on the computer, engaged in daily work-outs on the treadmill and cared for 2 dogs. She occasionally would visit her sister and had friends on the internet. AR 348. She had a driver's license and would drive to appointments. She occasionally watched television and typically napped in the afternoon. AR 349.

On mental status examination, Plaintiff was alert, ambulatory and fully oriented. She presented in a moderately depressed mood with a moderate restriction of affect. Her thought processes were logical and goal-oriented. Her insight was fair. Her Folstein Mini Mental Status

1   Examination score was 28/30.  AR 349.  On the MMPI-2, Plaintiff presented clinically as

2   depressed, apathetic and anxious, with a reported number of physical difficulties.  AR 350.

3       Dr. Morgan diagnosed Plaintiff with depressive disorder, not otherwise specified, rule out

4   dysthymic disorder, and anxiety disorder, not otherwise specified.  He assigned her a Global

5   Assessment of Functioning ("GAF") of 55.  AR 351.  Dr. Morgan opined that Plaintiff presented

6   with a moderate level of impairment and it was "not severe."  AR 352.  Her concentration and

7   attention was adequate on the mental status examination and, at worst, was borderline as noted

8   on testing.  She was capable of understanding, remembering and carrying out simple instructions.

9   She was capable of interacting with co-workers, supervisors and the public.  She likely would be

10  able to participate in the work-place environment regarding regular attendance, matters of safety

11  and dealing with day-to-day stressors with no more than moderate difficulties.  Plaintiff had yet

12  to participate actively in psychiatric care to address her psychological difficulties.  AR 352.

13      Dr. Morgan completed a Psychiatric Review Technique form and opined that Plaintiff's

14  mental impairment was not severe.  AR 331.  AR 331.  She had moderate restriction of activities

15  of daily living, moderate difficulties in maintaining social functioning and moderate difficulties

16  in maintaining concentration, persistence or pace.  AR 341.

17      Dr. Morgan also completed a Medical Source Statement, Psychiatric form.  He opined

18  that Plaintiff had a mild impairment in the ability to relate and interact with supervisors and co-

19  workers.  She had a moderate impairment in the ability to understand, remember and carry out an

20  extensive variety of technical and/or complex job instructions.  She had a satisfactory ability to

21  maintain concentration and attention for at least two increments.  She had a moderate impairment

22  in the ability to withstand the stress and pressures associated with an eight-hour work day and

23  day-to-day work activity.  She had a satisfactory ability to handle funds.  Her prognosis was fair

24  with continuing treatment.  AR 345.

25      Between February 28 and April 27, 2003, Plaintiff received treatment from psychiatrist,

26  Alvin E. Neumeyer, M.D.  In March 2003, Plaintiff reportedly was doing better.  In April 2003,

27  she reported episodes of fatigue and urinary incontinence.  AR 354.

28

On March 25, 2003, Plaintiff informed Dr. Masson that she was seeing a psychiatrist who prescribed Xanax.  She had no anxiety since starting Zyprexa and Neurontin.  AR 374.

On April 25, 2003, Plaintiff saw Dr. Hetnal for her diabetes and hyperlipidemia.  Plaintiff had improved glycemic control.  AR 368.

On April 28, 2003, Plaintiff complained of urinary incontinence.  Dr. Masson assessed her with mixed incontinence.  AR 364.

In May 2003, Dr. Neumeyer prepared a Complete Medical Report (Mental) form.  He stated Plaintiff had a panic disorder and was being treated with Xanax, Zyprexa and Prozac.  Her response to treatment and prognosis were both good.  AR 485.  Treatment notes indicated she was doing well.  AR 485, 537.

On May 20, 2003, Dr. Neumeyer also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form.  He opined that Plaintiff had good ability to relate to co-workers, to interact with supervisors, to function independently and in her use of judgment.  She had fair ability to follow work rules and to maintain attention/concentration.  She had poor ability to deal with the public and to deal with work stress.  AR 486.  She also had poor ability to understand, remember and carry out complex job instructions, but fair ability to understand, remember and carry out detailed, but not complex job instructions and fair ability to understand, remember and carry out simple job instructions.  Her ability to maintain personal appearance was good.  Her ability to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability were fair.  AR 487.  She could manage benefits in her own best interest.  AR 488.

On June 2, 2003, Dr. Masson prepared a Complete Medical Report (Physical) form.  Dr. Masson indicated that Plaintiff's treatment history included fibromyalgia, anxiety and neck pain.  Plaintiff had clinical findings of multiple trigger points and pressured speech.  She also had laboratory findings of C-spine spondylosis, DJD and spurring.  Dr. Masson diagnosed Plaintiff with cervicalgia, fibromyalgia and anxiety.  Plaintiff was treated with anxiolytics, muscle relaxants and mood stabilizers.  Dr. Masson opined that Plaintiff was still very symptomatic and her prognosis was fair.  AR 489.

1    On June 20, 2003, Dr. Neumeyer noted that Plaintiff was doing better with panic attacks.

2    AR 537.

3    A July 1, 2003 sleep study showed no significant sleep-disordered breathing.  AR 501.

4    On July 9, 2003, Dr. Morgan provided Plaintiff's counsel with a clarification of his

5    March 20, 2003 report.  Dr. Morgan indicated that Plaintiff's level of impairment was severe, but

6    not expected to last 12 months.  AR 588.  She had moderate limitation in her ability to remember

7    locations and work-like procedures, slight limitation in her ability to understand and remember

8    very short and simple instructions and moderate limitation in her ability to understand a number

9    of detailed instructions.  Her ability to carry out very short and simple instructions was slightly

10   limited and her ability to carry out detailed instructions was moderately limited.  She had

11   moderate limitation in her ability to maintain attention and concentration for an extended period

12   and moderate limitation in her ability to perform activities within a schedule, maintain regular

13   attendance and be punctual with customary tolerances.  She had slight limitation in her ability to

14   sustain an ordinary routine without special supervision, slight limitation in the ability to work in

15   coordination within a proximity to others without being distracted by them, slight limitation in

16   the ability to make simple work-related decisions and moderate limitation in her ability to

17   complete a normal workday and work week without interruptions from psychologically based

18   symptoms and moderate limitation in her ability to perform in a consistent pace without an

19   unreasonable number and length of rest periods.  AR 589.

20   Dr. Morgan further opined that Plaintiff had moderate limitations in her ability to interact

21   appropriately with the general public, to accept instructions and respond appropriately to

22   criticism from supervisors and to get along with co-workers or peers without distracting them or

23   exhibiting behavioral extremes.  She had a slight limitation in her ability to ask simple questions

24   or request assistance.  AR 589.  Plaintiff also had slight limitation in her ability to respond

25   appropriately to changes in a work setting and to be aware of normal hazards and take

26   appropriate precautions.  She had moderate limitation in the ability to travel in unfamiliar places,

27   use public transportation or to set realistic goals and make plans independently of others.  AR

28   589, 591-94.

1    On July 23, 2003, Dr. Hetnal indicated that Plaintiff's diabetes control appeared to be fair

2    with diet, but her LDL cholesterol was suboptimal.  AR 566.

3    On July 24, 2003, Dr. Neumeyer noted no panic attacks.  On August 24, 2003, she was

4    doing well regarding panic attacks.  In September 2003, she was noted to be doing pretty good.

5    In November 2003, her panic attacks were fine.  AR 538.

6    On November 7, 2003, Dr. Hetnal opined that Plaintiff's diabetes control was fair and her

7    triglycerides were still somewhat elevated.  She was to continue with diet.  AR 533.

8    On November 12, 2003, Plaintiff complained of fatigue to Dr. Masson.  Plaintiff found

9    herself struggling to stay awake while driving and noted enuresis when she sleeps.  AR 542.  Dr.

10   Masson suspected that the sleep episodes were due to multiple medications, but the possibility of

11   narcolepsy would be investigated with an EEG and a neurology referral.  AR 543.

12   On November 20, 2003, Plaintiff was seen by James Smith, M.D., for a neurologic

13   evaluation.  Plaintiff complained of episodes where she falls asleep.  Dr. Smith assessed Plaintiff

14   with probable narcolepsy and possible simple daytime drowsiness related to multiple medications

15   and physical inactivity.  AR 567-68.  He prescribed Ritalin.  AR 568.

16   On December 19, 2003, Lydia Wytrzes, M.D., completed a report regarding Plaintiff's

17   sleepiness.  Dr. Wytrzes opined that the cause of Plaintiff's progressive daytime sleepiness was

18   unclear and her sedating medications alone "appear to be insufficient to account for symptoms,

19   especially with history of sleepiness predating use of drugs like Neurontin and Xanax."  AR 596.

20   Dr. Wytrzes differentially diagnosed idiopathic hypersomnia, narcolepsy without cataplexy or

21   other hypothalamic condition.  Dr. Wytrzes further opined that with urinary incontinence,

22   frequent headaches and memory complaints, a primary CNS lesion needed to be excluded.  She

23   recommended further sleep studies.  AR 596.

24   On January 8, 2004, Dr. Logue opined that based on two sleep studies it was "very

25   unlikely [Plaintiff's] excessive fatigue is secondary to sleep apnea, and narcolepsy is very

26   unlikely."  AR 494.  He asserted that Plaintiff's medications could "most certainly" cause

27   excessive daytime somnolence.  AR 494.

28

On February 27, 2004, Plaintiff saw Dr. Hetnal for follow up on her diabetes and hyperlipidemia.  Plaintiff's glycemic control appeared excellent.  She also had excellent results in her hyperlipidemia with combination therapy and good glycemic control.  AR 530.

In March 2004, Dr. Neumeyer noted that Plaintiff was doing well regarding panic attacks. In May 2004, she was doing okay with no panic attacks.  AR 538.

On June 9, 2004, Plaintiff told Dr. Masson that she was "pretty good" and noted less stress incontinence.  AR 544.  Her shoulder was better with some activity modification.  AR 545.

In July 2004, Dr. Neumeyer noted no panic attacks.  In August 2004, Plaintiff was doing better.  AR 538.

On August 13, 2004, Plaintiff saw Dr. Hetnal.  Plaintiff's glycemic control was suboptimal, but her hypertension was under good control.  AR 514-15.

In September 2004, Plaintiff reported to Dr. Neumeyer that she cried over the "stupidest things" and "can't take stress."  AR 759.

On October 6, 2004, Plaintiff saw Dr. Masson for left shoulder pain.  AR 732.  Plaintiff reported that when reaching, her shoulder pain was so severe she could not move.  The pain radiated down into the forearm and she felt pain over the left scapula.  She also noticed pain when sweeping.  AR 732.  On examination, Plaintiff's left shoulder was normal, with full range of motion, no pain, no tenderness and no deformity.  Dr. Masson discussed range of motion with Plaintiff.  AR 733.  Left shoulder x-rays identified no abnormality.  AR 734, 736.

On October 8, 2004, Dr. Hetnal indicated that Plaintiff's postprandial hypoglycemia had improved since on Precose.  Dr. Hetnal suggested weight loss.  AR 725.

Dr. Neumeyer's treatment notes indicated that Plaintiff was doing good in November 2004 and doing well in December 2004.  In January 2005, she was having no panic attacks and no depression.  AR 759.

On February 25, 2005, Plaintiff saw Dr. Hetnal for follow-up on her diabetes.  Dr. Hetnal noted that Plaintiff had not had any lab work done, had not been taking Precose and had not been following any diet.  She reportedly was eating a lot of carbohydrate-containing snacks to "stay

awake." AR 747.  Dr. Hetnal recommended that Plaintiff work on her weight and do some daily

walking.  AR 748.  Plaintiff also saw Dr. Masson for right ankle swelling.  AR 754.

On March 11, 2005, Plaintiff saw Dr. Masson for complaints of slurred speech and

stuttering.  Her family stated that she sounded drunk.  Plaintiff's major concern was falling

asleep.  AR 739.  Dr. Masson opined that many of Plaintiff's symptoms, including excessive

sleepiness were side of effects of medications.  AR 740.  Dr. Masson hoped that on the

Cymbalta, Plaintiff could decrease Neurontin.  AR 740.

On April 12, 2005, Plaintiff saw Dr. Masson for complaints of dizziness.  She reported

almost losing control of the car, not recognizing her girlfriend at the door one day and then

falling against the door.  Plaintiff's psychiatrist suggested that she was having vasovagal

episodes, but her troponin and EKG were within normal limits.  The psychiatrist did not attribute

the symptoms to Neurontin, but to low tolerance of stress.  AR 708.  Dr. Masson assessed

Plaintiff with syncopal episodes, probably vaso-vagal, and referred her to cardiology.  AR 710.

On May 11, 2005, Plaintiff saw Dr. Thomas Salopek for psoriasis of her left heel.  On

examination, she had 1+ pitting edema of her right foot.  The source of her lymphedema was not

clear.  She was encouraged to use compression stockings and keep her legs elevated.  AR 700.

On May 13, 2005, Plaintiff saw PA Madsen for complaints of chronic neck pain.  She

reported decreased range of motion and some left shoulder and left scapular pain.  She indicated

that she had to drive especially carefully because she had trouble turning her head.  She did not

describe any numbness in her fingertips or feet or loss of fine motor skills.  On physical

examination, she had guarded cervical range of motion, but no real radicular symptoms were

reproduced.  She had a negative Hoffman test and her gait was normal.  Motor function was 4/5

and symmetric.  PA Madsen recommended that Plaintiff continue conservative treatment and a

pain management consultation.  AR 697.  Cervical spine x-rays showed mild to moderate

degenerative changes at multiple levels, more on the left than right.  AR 698.

On May 18, 2005, Plaintiff saw Dr. Masson for complaints of edema to the feet and legs.

AR 690.  She also reported falling asleep uncontrollably, noting Adderall helped, but her pain

1   was too bad if she cut down on Neurontin.  AR 690.  On examination, Plaintiff had +2 edema in

2   her extremities.  Dr. Masson gave Plaintiff a trial of Lasix for swelling.  AR 691.

3        On May 23, 2005, Plaintiff reported that she had been "ok" panic wise.  AR 758.

4        On June 1, 2005, Plaintiff saw Dr. William Pote for diabetes.  Plaintiff's sugars had been

5   high and Dr. Pote advised her to be more careful with diet.  AR 673.

6        On June 5, 2005, Plaintiff contacted Dr. Masson's office and reported that her calf and

7   leg were both swollen and turning purple.  She was advised to go the emergency room.  AR 666.

8        On June 9, 2005, Plaintiff underwent a venous duplex examination of the right lower

9   extremity, which was normal.  There was no evidence of deep venous thrombosis.  AR 664.

10       On June 15, 2005, Plaintiff saw Dr. James Smith for a neurology consultation following

11  two episodes in which she was awakened by movement of her left arm one time and movement

12  only of her right hand one time.  Dr. Smith opined that there was a very remote possibility of

13  simple partial motor seizures, but the description was "very inadequate" and it was a possible

14  narcoleptic phenomenon of some type.  AR 659.  Plaintiff was to continue Adderall and undergo

15  an EEG.  AR 659.

16       On June 16, 2005, Plaintiff saw Dr. Lon Keith for a cardiology consultation due to light-

17  headedness, dizziness and near syncope.  AR 652.  Plaintiff reported a history of chronic

18  dependent edema and recurrent episodes of headache, dizziness and anxiety disorder.  She also

19  reported fatigue, tiredness, lack of energy and difficulty sleeping.  AR 653.  On examination, she

20  demonstrated an orthostatic drop in blood pressure on standing.  Dr. Keith recommended an

21  exercise stress Myoview and tilt-table testing.  AR 654.

22       On June 20, 2005, Plaintiff saw PA Madsen in the orthopedic department.  AR 663.  On

23  physical examination, there were no new objective findings.  PA Madsen assessed Plaintiff with

24  myofascial pain syndrome, cervical spondylosis and cervicalgia and planned to refer her to Dr.

25  Gesson for pain management.  AR 663.

26       On June 20, 2005, Dr. Masson diagnosed Plaintiff with myalgia and mysositis NOS and

27  decreased her Neurontin.  AR 648-49.  Treatment notes reflected that Plaintiff had more than 20

28  current prescriptions, including Adderall, Cymbalta, Neurontin, Clonidine and alprazolam.  AR

1  648. She also had an unresolved problem list that included hypertension nos, myalgia and

2  myositis, generalized anxiety disorder and diabetes mellitus type 2. AR 650.

3      On June 21, 2005, Plaintiff saw Dr. Randy Fralick for complaints of both stress and urge

4  incontinence. AR 639. On examination, coughing caused Plaintiff to leak urine grossly on the

5  table. Dr. Fralick assessed Plaintiff with mixed urinary incontinence, anxiety and nocturnal

6  enuresis. She was to undergo further testing. AR 640-41.

7      On June 20, 2005, Dr. Neumeyer noted Plaintiff was doing reasonably well. AR 758.

8  She was prescribed Xanax three times a day. AR 757.

9      On June 29, 2005, a tilt-table test was negative. AR 628-29.

10      On July 1, 2005, Plaintiff saw Dr. Hetnal for her diabetes and hyperlipidemia. AR 624.

11  Plaintiff had significant pedal edema. AR 625. Although her recent control of diabetes was

12  improved, her hemoglobin Alc was still high. Plaintiff's medication was changed to Vytorin for

13  hyperlipidemia. AR 624-25.

14      On July 7, 2005, Plaintiff's EEG was essentially normal. AR 619-20.

15      On July 20, 2005, Plaintiff saw Dr. Lon Keith for evaluation of syncope and near

16  syncope. AR 601. During a review of systems, Plaintiff complained of anxiety, panic attacks

17  and intermittent episodes of chest discomfort. AR 602. Plaintiff had an abnormal stress

18  Myoview with evidence of reversible anterior wall ischemia. Dr. Keith recommended cardiac

19  catheterization, but Plaintiff opted for medical therapy. AR 602.

20      In a questionnaire, Dr. Keith opined that the medical problems for which he treated

21  Plaintiff did not preclude her from performing any full-time work at any exertional level,

22  including the sedentary level. AR 755. He opined that the combination of her impairments

23  restricted her to doing no more than sedentary work and identified her primary impairments as

24  diabetes and coronary artery disease. AR 755. Dr. Keith further opined that Plaintiff could sit 2-

25  3 hours and stand and/or walk less than 1 hour at one time. Over an 8-hour period, she could sit

26  for 2-3 hours and stand and/or walk less than 1 hour. She did not need to lie down or to elevate

27  her legs. She had chest pain and fatigue with exertion. AR 755.

28

In July 2005, Dr. Masson opined that Plaintiff's medical problems precluded her from performing any full-time work at any exertional level, including the sedentary level. Her primary impairments were fibromyalgia, anxiety and diabetes with objective findings of "[r]eport of pain per patient," labs and x-rays consistent with degenerative joint disease. AR 763. Plaintiff could sit for 1 hour and stand and/or walk 10 minutes at one time. In an 8-hour period, she could sit 2 hours and stand and/or walk 1 hour. She must lie down or elevate her legs every 3-4 hours. Dr. Masson opined that Plaintiff had been disabled since June 2, 2003. AR 763.

On July 22, 2005, Dr. Smith, Plaintiff's neurologist, opined that the medical problems for which he treated Plaintiff did not preclude her from performing any full-time work at any exertional level, including the sedentary level. She was precluded from performing occasional lifting of 20 pounds and frequent lifting of 10 pounds. Based on her clinical history, Plaintiff's primary impairment was narcolepsy with attendant symptoms of falling asleep during all activities. She could sit 30 minutes and stand and/or walk 30 minutes at one time. In an 8-hour period, she could sit 2 hours and stand and/or walk 1 hour. AR 764. She did not need to lie down or to elevate her legs. Dr. Smith noted that Plaintiff had multiple medical problems along with narcolepsy. AR 764.

On July 25, 2005, Dr. Neumeyer opined that the medical problems for which he treated Plaintiff did not preclude her from performing any full-time work at any exertional level, including the sedentary level. Plaintiff's combination of impairments did not restrict her to doing no more than sedentary work. AR 765. Dr. Neumeyer identified Plaintiff's primary impairment as panic disorder and noted that she had severe anxiety under stress. AR 765. Her limitations were all work related due to panic disorder. AR 765.

On August 1, 2005, Dr. Neumeyer prepared a Complete Medical Report (Mental) form. He identified that Plaintiff had a panic disorder, she was taking Xanax, her response to treatment was fair and her prognosis was poor. AR 766. Dr. Neumeyer also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form. He opined that Plaintiff had fair ability to relate to co-workers and function independently. She had poor ability to follow work rules, deal with public, use judgment, interact with supervisors, deal with work stress and

maintain attention/concentration.  AR 767.  She also had poor ability to understand, remember

and carry out complex job instructions and to understand, remember and carry out detailed, but

not complex job instructions.  She had fair ability to understand, remember and carry out simple

job instructions.  AR 768.  She had fair ability to maintain personal appearance, but poor ability

to behave in an emotionally stable manner, relate predictably in social situations and demonstrate

reliability.  AR 768.  She was capable of managing benefits.  AR 769.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of myofascial pain

disorder, diabetes, narcolepsy, reversible ischemia and anxiety.  AR 20.  Despite these

impairments, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to

stand and/or walk for six hours in an eight hour workday and sit without limitation when not

required to stand or walk.  She could lift and/or carry ten pounds frequently and twenty pounds

occasionally.  She could climb stairs and ramps, stoop/bend, kneel, crouch and squat occasionally

but should never crawl or climb ladders, ropes or scaffolds.  She should not be required to reach

overhead with the bilateral upper extremities and should not be exposed to hazards, such as

unprotected heights or moving machinery.  She also had limited ability to interact appropriately

with co-workers and the general public and should have restricted contact with both.  AR 22.

Although Plaintiff was unable to perform past relevant work, the ALJ concluded that there were

jobs that existed in significant numbers in the national economy that she could perform.  AR 25-

26.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision

to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

the Court must determine whether the decision of the Commissioner is supported by substantial

evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla,"

*Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

*Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.,* *Burkhart v. Bowen,* 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See* *Sanchez v. Sec'y of Health and Human Serv.,* 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen,* 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability.  *Terry v. Sullivan,* 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(g).  Applying this process in this case, the ALJ found that Plaintiff: (1) has not engaged in substantial gainful activity during the relevant time period; (2) has an impairment or a combination of impairments that is considered "severe" (myofascial pain disorder, diabetes, narcolepsy, reversible ischemia and anxiety) based on the requirements in the Regulations (20 CFR §§ 404.1520); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform her past relevant work; but (5) there are jobs existing in significant numbers in the national economy that she can perform.  AR 20-26.

1   Here, Plaintiff contends that the ALJ erred by (1) rejecting the residual functional

2   capacity opinions of her treating physicians and (2) failing to credit the limitations assessed by

3   the consultative psychologist.  Plaintiff also alleges that the ALJ's credibility finding lacks the

4   support of substantial evidence.

**DISCUSSION**

6   A.   Treating Physician Opinions

7   Plaintiff first asserts that the ALJ erred in rejecting the residual functional capacity

8   opinions of her treating physicians.  Generally, the opinions of treating doctors should be given

9   more weight than the opinions of doctors who do not treat the claimant.  *Reddick v. Chater*, 157

10   *F.3d 715, 725 (9th Cir.1998)*; *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the

11   treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear

12   and convincing" reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.

13   Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject

14   this opinion without providing "specific and legitimate reasons" supported by substantial

15   evidence in the record.  *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This

16   can be done by setting out a detailed and thorough summary of the facts and conflicting clinical

17   evidence, stating his interpretation thereof, and making findings.  *Magallanes  v. Bowen*, 881

18   F.2d 747, 751 (9th Cir.1989).  The ALJ must do more than offer his conclusions.  He must set

19   forth his own interpretations and explain why they, rather than the doctors', are correct.  *Embrey*

20   *v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).  Therefore, a treating physician's opinion must

21   be given controlling weight if it is well-supported and not inconsistent with the other substantial

22   evidence in the record.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 n. 10 (9th Cir. 2007).

23   1.   Dr. Neumeyer

24   Plaintiff contends that the ALJ improperly rejected the mental residual functional

25   capacity assessment by her treating psychiatrist, Dr. Neumeyer.  Both parties suggest that the

26   ALJ gave lesser weight to Dr. Neumeyer's opinion in favor of the December 2002 opinion of

27   consultative examiner, Dr. Fields.  Opening Brief, p. 13-14; Opposition, p. 7 n. 4.  If a treating

28   doctor's opinion is contradicted by another doctor, the ALJ must provide "specific and legitimate

1  reasons" supported by substantial evidence in the record to reject the treating doctor's opinion.

2  *Lester*, 81 F.3d at 830.  In this case, unlike the determination regarding Plaintiff's physical

3  functioning, the ALJ did not specifically explain the weight afforded the opinion evidence from

4  Dr. Fields or from the state agency medical consultants regarding Plaintiff's mental functioning.

5  AR 24.  The ALJ's decision indicates only that lesser weight was afforded to Dr. Neumeyer's

6  opinion.  AR 24.  It is not improper for a court to read part of an ALJ's decision discussing one

7  physician's findings and opinion, and draw inferences relevant to another physician's findings

8  and opinions.  *See Magallanes*, 881 F.2d at 755 (holding that it is proper for this court to read

9  that part of the ALJ's decision discussing one physician's findings and opinion, and draw

10  inferences relevant to another's findings and opinions).  Here, however, the record is not

11  sufficiently clear because the ALJ appeared to incorporate only a portion of Dr. Fields' opinion

12  in the RFC.  AR 22.  Further, the ALJ accepted portions of Dr. Neumeyer's functional

13  assessment, but rejected other portions without explanation.  AR 24.

14         Plaintiff also argues that the ALJ did not provide specific and legitimate rationale for

15  rejecting Dr. Neumeyer's opinion.  In this case, the ALJ gave lesser weight to Dr. Neumeyer's

16  August 2005 assessment that Plaintiff had a poor ability to make occupational or personal

17  adjustments because it was "inconsistent with his treatment notes of June 2005."  AR 24.  An

18  ALJ may reject a treating physician's opinion that is inconsistent with the physician's own

19  treating records.  *See, e.g., Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008)

20  (incongruity between treating physician's questionnaire responses and the medical records

21  provides a specific and legitimate reason for rejecting treating physician's conclusion); *Bayliss v.*

22  *Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (ALJ permitted to reject treating physician

23  opinion that contradicts physician's clinical notes).  In this instance, reference to Dr. Neumeyer's

24  isolated treatment notation that Plaintiff was "doing reasonably well" is not legitimate because, at

25  a minimum, it ignores her longitudinal mental health treatment and the increasing levels of

26  medication needed to treat her anxiety.  AR 757.  While other evidence in the record may well

27  constitute substantial evidence for a disability determination, the ALJ must still provide specific

28

1  and legitimate reasons for rejecting Dr. Neumeyer's opinion regarding Plaintiff's mental

2  limitations.

3      Plaintiff further asserts that the ALJ's reasoning is not legitimate because Dr. Neumeyer's

4  treatment notes reflect complaints of fatigue, which the ALJ did not address.  As discussed more

5  fully below, the ALJ erred with respect to the functional impact of Plaintiff's fatigue and

6  excessive daytime somnolence.  However, with respect to Dr. Neumeyer's opinion, Plaintiff's

7  argument is misdirected.  Although Dr. Neumeyer appeared to quote Plaintiff, noting "'I feel

8  fatigue all the time,'" he did not rely on clinical findings of fatigue to support his opinion.  AR

9  765, 768.  Instead, Dr. Neumeyer based his 2005 opinion on findings of "severe anxiety under

10 stress" due to Plaintiff's panic disorder.  AR 765.

11     Plaintiff next argues that the ALJ misstated Dr. Neumeyer's opinion that Plaintiff was

12 capable of understanding, remembering, and carrying out simple job instructions.  However, it

13 appears that Plaintiff is relying on Dr. Neumeyer's 2003 opinion (AR 485-88), while the ALJ

14 relied on Dr. Neumeyer's August 2005 opinion (AR 767-69; Exhibit 26F/2-4).  In his decision,

15 the ALJ summarized Dr. Neumeyer's opinion to state that Plaintiff retained the ability to

16 understand, remember and carry out simple job instructions and relate to co-workers.  AR 24.

17 Dr. Neumeyer opined in 2005 that Plaintiff had fair ability in these areas.  AR 767-68.  As such,

18 the ALJ did not misstate Dr. Neumeyer's opinion.  Plaintiff further argues that the ALJ failed to

19 address Dr. Neumeyer's concomitant findings in 2003 of "poor" abilities in other areas of mental

20 functioning.  Opening Brief, p. 22.  As noted, however, the ALJ was reviewing Dr. Neumeyer's

21 2005 opinion.  Nonetheless, the ALJ did not address Dr. Neumeyer's 2005 findings of "poor"

22 abilities in other areas.

23     Dr. Fields

24     Plaintiff argues that the ALJ improperly ignored a relevant portion of the assessment of

25 consultative psychologist, Dr. Fields.  Specifically, Plaintiff contends that the ALJ's RFC failed

26 to credit Dr. Fields' finding that Plaintiff had a limited ability to deal with supervisors.  AR 282.

27      With regard to Plaintiff's mental limitations, the ALJ found that Plaintiff had "a limited

28 ability to interact appropriately with co-workers and the general public and should have restricted

contact with both." AR 22.  Although the parties again suggest that the ALJ relied on Dr. Fields'
opinion, the ALJ does not cite Dr. Fields' opinion in support of his RFC finding regarding
Plaintiff's mental limitations.  AR 22-25.  The only support for the mental portion of the RFC
cited by the ALJ is Dr. Neumeyer's opinion that Plaintiff "retains the ability to understand,
remember and carry out simple job instructions and relate to co-workers."  AR 24.  However, the
ALJ fails to mention that Dr. Neumeyer also opined that Plaintiff had a "poor ability to interact
with supervisors."  AR 767.  Despite the finding of Dr. Neumeyer that Plaintiff had poor ability
to interact with supervisors and the finding of Dr. Fields that Plaintiff's ability to interact with
supervisors was moderately limited, the ALJ did not include or discuss these limitations in his
final decision.  The record does not reflect whether the ALJ overlooked the limitations or
whether he intended to reject one or both of them.

Insofar as the Commissioner contends that the hypothetical posed to the vocational expert
"largely encompassed" Dr. Fields' limitations, this contention is without merit.  The ALJ's
hypothetical failed to identify any limitation regarding Plaintiff's ability to interact with
supervisors.  *See, e.g., Andrews v. Shalala*, 53 F.3d 1035, 1044 (9th Cir.1995).  The record does
not reflect whether the vocational expert's testimony would be different or if the assessment of
available jobs would be further eroded if a limitation on the relationship with supervisors is
included in the hypothetical.  The ALJ's implicit rejection of the opinions of Drs. Neuymeyer and
Fields and his failure to include any limitation in the hypothetical question constituted errors of
law.  *See, e.g., Lester*, 81 F.3d at 830-31; *Salvador v. Sullivan*, 917 F.2d 13, 15 (9th Cir.1990).

2.   Dr. Keith

Plaintiff contends that the ALJ erred in his rejection of Plaintiff's treating cardiologist,
Dr. Keith (identified by the ALJ as "Lon Keats").  Dr. Keith opined that Plaintiff would be
limited by her chest pain and fatigue with exertion due to coronary artery disease.  AR 755.  The
ALJ gave limited weight to Dr. Keith's assessment because it was "not well-supported by the
weight of the evidence of record."  AR 24.  As noted by the ALJ, Dr. Keith's treatment records
from July 2005 showed evidence of reversible anterior wall ischemia, which was treated
chemically.  AR 602.  The stress test revealed "low probability of stress induced ischemia."  AR

614-15.  There was no indication that Plaintiff underwent an angiogram.  Further, Plaintiff's reported chest pain was relieved by massage or simple pressure.  AR 601.  An ALJ may reject a treating physician's opinion that is inconsistent with treating records.  *See Bayliss,* 427 F.3d at 1216 (ALJ permitted to reject treating physician opinion that contradicts physician's clinical notes).  Accordingly, the ALJ properly assigned lesser weight to Dr. Keith's assessment that Plaintiff was disabled by coronary artery disease.

   3.   Dr. Smith

      Plaintiff argues that the ALJ improperly rejected the opinion of her treating neurologist, Dr. Smith.  Dr. Smith opined that Plaintiff would be limited in her ability to work due to "narcolepsy" and its "attendant symptoms."  The ALJ attributed less weight to Dr. Smith's opinion because it was not well-supported by the weight of the evidence of record.  AR 24.  The ALJ noted that diagnostic testing "did not produce a definitive diagnosis of narcolepsy and ... the claimant's daytime drowsiness was probably a result of multiple medications."  AR 24.

      Plaintiff agrees that the diagnosis of narcolepsy was not definitively reached, but argues that the salient medical finding is Plaintiff's excessive daytime somnolence.  Opening Brief, p. 16.  Plaintiff contends that even if it is a side effect of her medications and not narcolepsy, her fatigue must be considered by the ALJ.  The Court agrees.  Side effects of prescribed medication may have a significant effect on an individual's ability to work, and therefore should be considered in making a disability determination.  *Varney v. Secretary of Health & Human Serv.,* 846 F.2d 581, 585 (9th Cir. 1988).  Although the ALJ discussed Plaintiff's fatigue, he concluded that she was "overmedicated" and discounted her testimony.  AR 23.  According to the record, multiple physicians suspected that Plaintiff's sleep episodes resulted from "multiple medications" and at least two physicians suspected narcolepsy.  However, no physician opined that Plaintiff was "overmedicated" or that her medications were not necessary for her treatment.  AR 494, 543, 568, 596, 764.  An ALJ may not use his own medical judgment in lieu of Plaintiff's prescribing physicians.  *Gonzalez Perez v. Sec'y Health & Human Serv.,* 812 F.2d 747, 749 (1st Cir. 1987) ("The ALJ may not substitute his own layman's opinion for the findings and opinion of a physician.").  Regardless of the cause, there is substantial evidence in the record that

Plaintiff suffered from fatigue and daytime sleepiness.  While the ALJ identified Plaintiff's narcolepsy as a severe impairment and acknowledged that she had daytime sleepiness, he did not consider its effect on her ability to work.  AR 20, 23-24.  Accordingly, the ALJ's omission of fatigue-related symptoms from the RFC was not supported by substantial evidence.  Furthermore, it follows that the ALJ erred in posing a hypothetical to the vocational expert that did not include all of Plaintiff's claimed limitations.  *Embrey,* 849 F.2d at 422 ("Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant....").  The VE's opinion about a claimant's residual functional capacity has no evidentiary value if the assumptions in the hypothetical are not supported by the record.  *Id.*

4.   Dr. Masson

Plaintiff asserts that the ALJ erred in his rejection of Dr. Masson's opinion that Plaintiff was disabled by her fibromyalgia, anxiety, and diabetes.  The ALJ primarily discounted the severity of the limitations imposed by Dr. Masson as inconsistent with objective findings of degenerative joint disease.  AR 25.  However, Dr. Masson's opinion was based on diagnosed conditions of anxiety, diabetes and fibromyalgia, not degenerative joint disease.  AR 763.

As to Plaintiff's fibromyalgia, the ALJ rejected Dr. Masson's opinion because the medical record did not include findings using the protocols of the American College of Rheumatology.  AR 25.  According to the record, Dr. Masson submitted at least two reports indicating that Plaintiff had been diagnosed with fibromyalgia based on clinical findings of multiple trigger points.  AR 326, 489.  That the ALJ may have discounted this opinion because Dr. Masson failed to delineate the trigger points identified by the American College of Rheumatology is not a sufficient basis to discount the treating physician's opinion.  The Ninth Circuit has recognized that fibromyalgia's cause is unknown, there is no cure and it is diagnosed "entirely on the basis of patients' reports of pain and other symptoms."  *Benecke v. Barnhart,* 379 F.3d 587, 590 (9th Cir. 2004).  Additionally, the Ninth Circuit has acknowledged that fibromyalgia's symptoms are entirely subjective and that there are no laboratory tests for its presence or severity.  *Rollins v. Massanari,* 261 F.3d 853, 855 (9th Cir. 2001) (quoting *Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir. 1996)).  Courts have found it error for an ALJ to discount a

28

treating physician's opinion as to resulting limitations due to a lack of objective evidence for fibromyalgia. *Benecke*, 379 F.3d at 594 and n.3; *see also Galvan v. Astrue*, 2010 WL 529440, *10 (E.D.Cal. Feb. 9, 2010) (ALJ's discounting of physicians' opinions simply because the doctors failed to checkoff or delineate the 18 trigger points identified by the American College of Rheumatology did not satisfy the requirement of citing specific and legitimate reasons supported by substantial evidence in the record); *Guevara v. Astrue*, 2009 WL 650736, *6 (C.D.Cal. Mar. 11, 2009) (noting that due to the nature of fibromyalgia, the absence of laboratory or clinical findings is not a legitimate basis for rejecting a treating physician opinion); *cf. Yunt v. Commissioner of Social Sec.*, 2008 WL 596226, *2 (E.D.Cal. Mar. 3, 2008) (concluding it was reasonable for ALJ to require treating physician's assessment of claimant with fibromyalgia to be supported by objective findings, such as grip strength and range-of-motion test data). Furthermore, if the ALJ found that Dr. Masson's reports lacked specificity or that he required more information, then the ALJ had a duty to inquire further regarding the bases of Dr. Masson's opinion. *See Smolen v.Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).

As to Plaintiff's anxiety, the ALJ discounted Dr. Masson's opinion regarding Plaintiff's limitations, but provided no reason for so doing. AR 24-25. The Commissioner contends that the ALJ was entitled to give lesser weight to Dr. Masson's opinion regarding the disabling nature of Plaintiff's anxiety because it was conclusory and unsupported. Opposition, p. 10. However, a reviewing court is constrained to review the reasons asserted by the ALJ. *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006). In this case, the ALJ did not provide any such reasons. Arguably, the ALJ addressed the effects of Plaintiff's anxiety in his consideration of treating psychiatrist, Dr. Neumeyer. However, this does not support the Commissioner's position because the ALJ erred in his consideration of Dr. Neumeyer's opinion.

As to Plaintiff's diabetes, the ALJ indicated that the record showed Plaintiff's diabetes was controlled with medication. AR 25. Plaintiff has not challenged this portion of the ALJ's decision and points to no evidence in the record suggesting that her diabetes was not controlled with medication. Throughout 2003, Dr. Hetnal noted that Plaintiff had improved glycemic control, which appeared to be fair with diet. AR 368, 566, 553. In February 2004, Plaintiff's

glycemic control was excellent.  AR 530.  Although Plaintiff's glycemic control was suboptimal in August 2004, her condition improved by October 2004 while on Precose.  AR 514-15, 725.  In July 2005, Plaintiff's control of her diabetes was noted to be improved.  AR 624-25.  The ALJ's conclusion regarding Plaintiff's diabetes is supported by the record.  AR 725.

B.    Credibility Analysis

Plaintiff next argues that the ALJ's finding that her complaints of disabling pain, anxiety and fatigue are not credible lacks the support of substantial evidence.  In *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007), the Ninth Circuit summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

> An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment.  *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the disbelief.'"  *Morgan*, 169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive."  *Id.*  Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing."  *Id.*

> Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand).  Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment."  *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

Here, the ALJ found that Plaintiff's statements concerning the intensity, duration and limiting effects of her symptoms were not entirely credible.  AR 23.  The ALJ first discredited Plaintiff's testimony because her treatment had been essentially routine and/or conservative in nature.  In so doing, the ALJ noted that there was evidence of degenerative disc disease, but no recommendations for further evaluation of Plaintiff's back and neck pain.  AR 24.  The ALJ also indicated that Plaintiff was medically treated for her reversible ischemia and there was no evidence that her chest pain was worsening.  According to the record, Plaintiff repeatedly was

30

advised that she was not a candidate for surgical intervention and she should continue "conservative treatment methods" for her disk degeneration.  AR 178, 182-83, 697.  The record also reflects that Plaintiff was chemically treated for her reversible ischemia.  AR 602.  Evidence of "conservative treatment" is sufficient to discount a claimant's testimony regarding severity of an impairment.  *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007).

The ALJ next discounted Plaintiff's credibility because the record did not provide a definitive diagnosis of narcolepsy and the ALJ suggested that her daytime drowsiness was the result of overmedication and physical inactivity.  AR 23.  As discussed, the record does not support the finding of overmedication and the ALJ may not substitute his judgment for that of Plaintiff's physicians.  Further, the ALJ's finding implicitly confirms that Plaintiff had drowsiness resulting from her medications.  Accordingly, the ALJ's reason for discounting Plaintiff's testimony regarding symptoms of fatigue and daytime drowsiness is not clear and convincing.

With regard to Plaintiff's psychological complaints, the ALJ acknowledged Plaintiff's anxiety, but noted it was better and her psychiatrist stated she was doing well.  AR 24.  An ALJ's finding that symptoms improved with medication is a valid consideration in assessing a claimant's credibility.  *Morgan v. Comm'r of Social Sec. Admin.,* 169 F.3d 595, 599 (9th Cir. 1999).  Plaintiff admits that her anxiety is better and her treatment records reflect improvement in anxiety and panic attacks with medication.  AR 24; Opening Brief, p.18.  Despite this admission, Plaintiff faults the ALJ for failing to acknowledge that her improvements coincided with increases in the dosage, type and frequency of medication and the resulting fatigue.  The ALJ did not incorporate this consideration into his credibility determination.

The ALJ also discounts Plaintiff's credibility based on her daily activities.  AR 24.  If a claimant is able to spend a substantial part of her day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations.  *Morgan*, 169 F.3d at 600.  The ALJ must make "specific findings relating to [the daily] activities" and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination.  *Orn*, 495

F.3d at 639 (citing Burch, 400 F.3d at 681).  In this case, the ALJ erred by failing to identify any specific daily activities or make findings relating to their transferability.  Instead, the ALJ simply concluded that Plaintiff's current denial of the ability to perform her daily activities was not consistent with the weight of the evidence.  AR 24.

> C.   Remand

Section 405(g) of Title 42 of the United States Code provides: "the court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  In social security cases, the decision to remand to the Commissioner for further proceedings or simply to award benefits is within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded.  Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate."  *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed.").

The Court finds that additional proceedings can remedy the ALJ's errors and therefore REMANDS the action for further proceedings.  On remand, the ALJ should re-evaluate the medical evidence regarding Plaintiff's mental limitations, anxiety, and fibromyalgia.  He also should re-evaluate the medical evidence concerning Plaintiff's claims of fatigue and what limitations, if any, fatigue has on her ability to work.  In addition, the ALJ should clarify whether any limitation on Plaintiff's relationship with supervisors is rejected, or whether it should be added to the hypothetical posed to the vocational expert.  He also should reassess Plaintiff's credibility.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

further proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Cheryl R. Maxim and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:**   **March 13, 2010**                        **/s/ Dennis L. Beck**
UNITED STATES MAGISTRATE JUDGE